**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**MARY ANN FORQUER,**

        **Plaintiff,**

**v.**                                **Civil Action No.: 1:15CV57**
                                          **(Judge Keeley)**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

        **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Mary Ann Forquer ("Plaintiff") brought this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the defendant, Commissioner of the Social Security Administration ("Defendant," and sometimes "the Commissioner"), denying Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for DIB on December 28, 2011, alleging disability beginning on October 9, 2010. Plaintiff's application was denied at both the initial and reconsideration levels. Plaintiff thereafter requested a hearing, which Administrative Law Judge Terrence Hugar ("ALJ") held on October 29, 2013. Plaintiff, represented by counsel, and Larry Ostrowski, PhD., an impartial Vocational Expert ("VE"), testified. On

January 9, 2014, the ALJ entered a decision finding Plaintiff was not disabled. Plaintiff appealed this decision to the Appeals Council and, on February 2, 2015, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.

## II. FACTS

### A. Personal History

Plaintiff was born on July 2, 1969, and was forty-four (44) years old at the time of the administrative hearing. She has a high school diploma and lived in Clarksburg, WV, at the time of the administrative hearing. (R. 50). Plaintiff's prior work experience included working as a store clerk, telemarketer, housekeeper, and cashier. Plaintiff's last place of employment was Ollie's Bargain Outlet, which ended after Plaintiff was injured on the job. (R. 47-50). As of the administrative hearing, Plaintiff is not married and does not have any children. . (R. 51).

### B. Medical History Summary

#### 1. Medical History Pre-Dating October 9, 2010

On March 30, 2006, Plaintiff went to Valley HealthCare System, complaining of severe depression, insomnia, decreased appetite resulting in weight loss, agitation and irritability, fatigue, difficulties with concentration and memory, and feelings of hopelessness. (R. 544). She reported to being treated at Health Right four years prior and being placed on medications, which she stopped taking after experiencing side effects. Id. During this visit, Plaintiff sought psychiatric services and individual therapy. Id. Thereafter, she was referred to Dr. Paul Clausell for a psychiatric evaluation.

On April 14, 2006, Dr. Clausell diagnosed Plaintiff with Type 1 Bipolar Disorder, and prescribed Risperdal. (R 548). It was also recommended that she receive therapy services from Gail Shibley 2-4 times per month. (R 550). Plaintiff reported symptoms that were at a "moderate to severe level." Id. If her symptoms increased to a crisis level, then she would receive crisis services from the Valley HealthCare System. (R. 550). As of April 18, 2006, she was receiving "high end services." Id.

On August 3, 2006, Plaintiff was discharged from services at Valley HealthCare System due to non-compliance with her treatment plan. (R. 565). Plaintiff failed to show for 7 of her 10 scheduled appointments Id. While receiving treatment at Valley Healthcare, Plaintiff received an initial intake assessment, individual therapy, pharmacological management and case management services. Id.

Over the following months, Plaintiff visited Milan Puskar Health Right, a primary care clinic, for evaluation and treatment. (R. 587-619). Plaintiff sought medication for Bipolar Disorder, and complained of experiencing depression, insomnia, irritableness, hypomania, and on one occasion being "invincible." (R. 588-89). Plaintiff also expressed that she had difficulty interacting with others. . (R. 587-88). During this period, laboratory tests were taken and Plaintiff was prescribed Zyprexa, Cymbalta, Seroquel and Trazadone. (R. 609-624).

On November 11, 2007, Plaintiff was seen by William Fremouw, PhD., for a mental status examination. (R. 591-95). Plaintiff presented symptoms of insomnia, a poor appetite and a volatile mood. (R. 592). She was diagnosed with Bipolar II Disorder, and Mixed Personality Disorder. (R. 593).

On February 11, 2009 and February 18, 2009, Plaintiff revisited Milan Puskar Health Right for a routine examination and to discuss her psychological medications, which were last refilled on January 8, 2008. (R. 640-43). It was determined that Plaintiff suffers from Psychosis Not Otherwise Specified, Anorexia, for fear of food contamination and High Cholesterol. (R. 641). Medications to improve sleep and mood were recommended. (R. 643).

### 2. Medical History Post-Dating October 9, 2010

On October 12, 2010, Plaintiff was admitted into the Emergency Room (ER) at United Hospital Center, complaining of lower back pain. (R. 753-59).  Plaintiff was diagnosed with lumbosacral strain, and prescribed Flexeril and Motrin.

On October 20, 2010, Plaintiff visited Bridgeport Express Care, complaining of back pain.  Plaintiff reported that she hurt her back lifting carpet and trash at work on October 9, 2010, and was taking Flexeril and Motrin to alleviate the pain. (R. 695).  No x-rays or diagnostics were completed at Plaintiff's emergency room visit, after her injury. X-ray of the thoracic spine was ordered following this visit. (R. 692). Plaintiff was diagnosed to have sprained the thoracic region, and was prescribed Amrix Er, Mobic and Ultram.

On October 21, 2010, Plaintiff went to Pinti Physical Therapy & Sports Medicine for an appointment concerning the back pain she was experiencing. (R. 701-703). Plaintiff complained of pain in the lower back and buttocks with pain moving up the back into the T and C spinal regions. (R. 701).  An x-ray of Plaintiff's thoracic spine was "normal." Id.

On October 27, 2010, Plaintiff returned to Bridgeport Express Care for a follow-up visit. (R. 692). Plaintiff complained of having a dull pain in the middle of her back which radiated into her neck. Plaintiff reported that her pain worsened by movement and lifting, and believed that physical therapy was making it worse. (R. 692). Plaintiff's diagnosis was a "sprained thoracic region," "cervical spinal stenosis," and "disc disorder with myelopathy not otherwise specified." (R. 694). A cervical and thoracic spine MRI was ordered. Id.

On November 8, 2010, Plaintiff's cervical and thoracic spine MRI was taken. (R. 699). The MRI results of the thoracic spine showed that the "[m]arrow signal and alignment look[ed] entirely normal" Id. No evidence suggested any "degenerative changes." Id. There was no spinal stenosis or disc herniation. Id. The cervical MRI showed that the marrow signal and alignment were "unremarkable except for slight straightening in the normal cervical lordotic curve." (R. 720). C2-C3 and C3-C4 levels were "unremarkable." Id. There was a "central disc bulge or disc protrusion with associated moderate severity canal stenosis" at C4-C5. Id. There was a "posterior osteophyte bar at C5-C6 pronouncing moderately severe canal stenosis." Id.

On November 26, 2010, Plaintiff went to Bridgeport Express Care, complaining of persistent pain in her neck and upper back along with her arms. (R. 832). She did not report numbness or tingling, and there was no loss of function in her arms. Id. She reported that she stopped taking her medication due to financial issues. Id. She was given Toradol and a prescription of Flexeril and Naprosyn. (R. 834).

On December 29, 2010, Plaintiff had a consultation with Dr. Richard A. Douglas at United Hospital Center in the Neurosurgery & Spine Center. (R. 708). Plaintiff

reported her back injury to Dr. Douglas who noted Plaintiff started to develop acute right lumbar pain after the injury and then started developing pain in her neck with numbness and tingling in her right arm along with occasional lancinating pain down her arm. Id. Plaintiff was prescribed a Medrol Dosepak, Voltaren, and Lorcet, and given a script for physical therapy and a referral to United Hospital Center Pain Management. (R. 711).

On February 23, 2011, Plaintiff was seen by Dr. Thomas F. Brockmeyer at The Orthopedic. Dr. Brockmeyer reported that Plaintiff denied her "well documented psychiatric history" and as a result questioned Plaintiff's veracity and/or memory of events.[1]. (R. 714). Dr. Brockmeyer opined that although Plaintiff's medical records support "a mild lumbosacral strain from which she quickly recovered, there was no evidence of a work-related cervical injury causing Plaintiff's current complaints. Id.

On April 11, 2011, Plaintiff went to United Pain Management at United Hospital Center, and was seen by Dr. Ahmed Mahmoud. Plaintiff expressed that her pain had been "constant" since her accident at work and that the pain radiated from her neck to the right upper extremity. (R. 716). Plaintiff also described the pain as "throbbing, sharp, and numbing" that increased with "bending, lifting, lying down and weather changes," and decreased by standing and applying heat. (R. 716). Radiological findings revealed Plaintiff had a cervical MRI that showed "spinal stenosis" at C4-C5, C5-C6 and C6-C7 and degenerative disc disease. Id. Dr. Mahmoud prescribed Neurontin and Amitriptyline. (R. 719).

---

[1] Dr. Brockmeyer asked Plaintiff repeated questions regarding her psychiatric history of which she repeatedly denied, which is in direct conflict with medical records from Milan Puskar Health Homeless Care Clinic on February 18, 2009, and at the Homeless Care Clinic in December of 2007. (R. 714).

On April 28, 2011, and June 16, 2011, Plaintiff was diagnosed with a neuromuscular disorder and "myofacial pain syndrome." (R. 746-48). Plaintiff received trigger point injections with no noted complications. Id.

On August 24, 2011, Plaintiff reported to the United Hospital Center Emergency Room, complaining of back and neck pain. (R. 801-03). A back examination revealed range of motion, speech and gait were normal. (R. 803). Plaintiff was prescribed Flexeril and Prednisone for her pain. Id.

Plaintiff was seen by Dr. Mahoud at United Pain Management in United Hospital Center, for cervical epidural steroid injections on September 28, 2011, and November 17, 2011. (R. 793, 795).

Two days later, Plaintiff returned to United Hospital Center Neurosurgery & Spine Center, complaining of persistent neck pain and tingling in her right arm. (R. 789). Dr. Richard Douglas ordered lateral flexion, neutral, and extension cervical spine x-rays. (R. 790).

On May 4, 2012, Plaintiff revisited the Family Medicine Center at the United Hospital Center, chiefly complaining of neck and back pain. (R. 839-45). Her radiological results revealed "regenerative endplate signal changes at C5 and C6" with "central disc herniation at C4-C5 causing moderate central canal stenosis and disc bulging and osteophyte formation causing moderate central canal stenosis and bilateral foraminal narrowing." (R. 841). "Mild disc bulging osteophytes" were found at C6-C7 without significant spinal stenosis. Plaintiff was advised to follow up with neurosurgeon and pain management clinic for further management. Id.

On March 19, 2012, Plaintiff went to Tri-State Occupational Medicine, complaining of continued neck and back pain. Dr. Stephen Nutter examined Plaintiff noting that Plaintiff stated that lifting hurts her neck and that at times she drops things because of the numbness in her right arm. (R. 827). Dr. Nutter concluded Plaintiff had some range of motion abnormalities of the shoulder and knees, but that there was no evidence of "rheumatoid arthritis, no rheumatoid nodules, capsular thickening, periarticular swelling or tophi." (R. 831). Dr. Nutter further noted that there was no ulnar deviation. Id.

On July 16, 2012, Plaintiff went to the Advanced Pain and Rehab Clinic complaining of severe neck and right shoulder pain. (R. 846). Dr. Mahmoud determined that Plaintiff had "degenerative disc disease, spinal spondylosis, facet arthropathy and muscle spasm." (R. 847).

Plaintiff was seen by clinical therapists in the WVU Department of Behavioral Medicine for psychotherapy several times in August 2012. (R. 853-948). The therapists aimed to treat Plaintiff's depression and teach her coping skills. Id.

Maria T. Moran, PhD, from the WVU Department of Behavioral Medicine, saw Plaintiff on January 23, 2013, for a psychological evaluation. (R. 849). Dr. Moran identified a number of stressors and concluded some diagnostic considerations include major depressive disorder, generalized anxiety disorder, and somatization disorder. (R 850).

On February 1, 2013, Plaintiff went to Monongahela Valley Association of Health Centers (MVA) complaining of back pain. (R. 1031) X-rays taken on February 6, 2013, revealed a "slight sclerosis of the posterior elements of L5-S1," possibly suggesting

beginning or early degenerative process. (R. 1033). The x-rays also revealed slight irregularity of the surfaces of C5-C6. Id. Plaintiff was prescribed Cymbalta and diclofenac sodium. Id.

On April 12, 2013, Plaintiff revisited MVA complaining of body aches and seeking a refill on medication. (R. 1021). Dr. Kranthi Ragireddy referred Plaintiff to a physical therapist and advised Plaintiff to stop taking Cymbalta and to start Neurontin and Elavil. (R. 1022).

On July 1, 2013, Plaintiff returned to MVA complaining of back pain and headaches. (R. 1019). Plaintiff's boyfriend reported that Plaintiff was having a nervous breakdown. Id. Dr. Ragireddy's assessment was "acute paranoid disorder" and "anxiety disorder NOS." (R. 1020). Plaintiff was referred to Fairmont General Hospital's emergency room. Id.

Plaintiff was admitted into Fairmont General Hospital on July 1, 2013, and was discharged on July 13, 2013. (R. 950). While there, Plaintiff complained of memory loss, headaches, poor sleep, not eating well, depression, confusion, and anxiousness. Id. Dr. Todd Magnes observed that Plaintiff did not appear to meet criteria for a "major depressive disorder or mania," but seemed to have "thought blocking and possible paranoia." Id. It was reported that Plaintiff had significant head trauma in the past. (R. 953). An EEG and MRI were taken; the EEG was normal, but the MRI showed "periventricular white matter changes." (R. 951). Plaintiff was evaluated by Dr. Mouhannad Azzouz from Neurology who opined that the "white ischemic changes" and history of head injuries may be causing Plaintiff's memory loss and difficulty with change, but did not contribute to her presenting symptoms —paranoia, anger, memory

loss, and anxiousness. Id. Her growing familiarity with the hospital, her routine there and medication are believed to have helped Plaintiff improve while staying at the hospital. Id. Plaintiff was prescribed Lyrica, Tramadol, Zyprexa and Augmentin. Id.

On July 29, 2013, Plaintiff went to MVA for a follow-up visit. She reported chronic pain in her neck and back and stated that her neck pain was worse than her back pain. (R. 1040-41).

On August 1, 2013, Plaintiff had a psychiatric follow-up visit with Dr. Todd Magnes at Fairmont General Hospital. Plaintiff reported that she was doing "mostly well" since discharge from the hospital but was continuing to experience migraine headaches, back pains, episodes of confusion, memory loss, and back pain. (R. 992). Plaintiff was given prescriptions for Zyprexa, and Elavil. (R. 993).

On August 28, 2013, Plaintiff returned to the emergency department at Fairmont General Hospital with mild symptoms of anxiety and depression. Examination of the back revealed "no spinal tenderness, no costovertebral tenderness" and a full range of motion. (R. 1045).

### 3. Medical Reports/Opinions

On October 9, 2009, state agency medical consultant, Dr. Frulvio Franyutti, completed a physical residual functional capacity ("RFC") assessment of Plaintiff. (R. 646-53). Dr. Franyutti found that no exertional, postural, manipulative, visual, environmental or communicative limitations have been established. Id. Plaintiff alleged having migraines, high cholesterol and anorexia. (R. 651). Plaintiff reported not eating because of a fear of food contamination. Id. She also reported that she walks, does

laundry, cleans, can prepare a meal and shop. Dr. Franyutti found that the diagnoses and MER does not support any limitations due to physical allegations. Id.

On November 17, 2009, a licensed psychologist Martin Levin, M.A., completed a mental status examination of Plaintiff. (R. 655). Plaintiff reported having both manic and depressive episodes, explaining that she "stays in bed as much as possible and avoids being around other people." (R. 658). Additionally, Plaintiff complained of having migraine headaches, high cholesterol levels and anorexia. Id. Dr. Levin concluded that Plaintiff was in a "prolonged depressive state" and diagnosed her with Bipolar I Disorder. Id. Dr. Levin further determined that if Plaintiff was provided an allowance, she was not competent to manage her own finances, and that her prognosis was poor. Id.

On January 5, 2010, state agency medical consultant, James W. Bartee, PhD., completed a mental residual functional capacity (MRFC) assessment of Plaintiff. (R. 659-62). Dr. Bartee found that across the functional and adaptive domains, Plaintiff had a number of mild to moderate limitations and one marked limitation, resulting in a severe impairment. (R. 661). However, Dr. Bartee concluded that the limitations do not meet a listing. Id. In summation, Dr. Bartee concluded Plaintiff does not pose a danger to herself or others in a routine, non-dangerous work-like setting; she can travel to and from familiar and unfamiliar locations, and can pursue short term goals for 2-3 weeks. Id.

On September 14, 2011, Dr. Frulvio Franyutti completed another physical RFC assessment of Plaintiff. (R. 780). Dr. Franyutti found that while Plaintiff possessed no manipulative, visual or communicative limitations, Plaintiff did possess exertional,

postural and environmental limitations. (R. 781-84). Regarding Plaintiff's exertional limitations, Dr. Franyutti found Plaintiff able to: (1) occasionally lift and/or carry ten pounds; (2) frequently lift and/or carry less than ten pounds; (3) stand and/or walk for approximately six hours in an eight-hour workday; (4) sit for approximately six hours in an eight-hour workday; and (5) push and/or pull with no limitations. (R. 781). Turning to Plaintiff's postural limitations, Dr. Franyutti noted that Plaintiff can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; however, Plaintiff can never climb ropes or scaffolds. (R. 782). Finally, concerning Plaintiff's environmental limitations, Dr. Franyutti stated that Plaintiff must avoid concentrated exposure to: extreme cold, extreme heat, vibration, fumes, odors, dusts, gases, poor ventilation and hazards such as machinery and heights. (R. 784). Dr. Franyutti, however, did note that Plaintiff need not avoid exposure to wetness, humidity or noise. Id.

During the physical RFC assessment, Plaintiff alleged that she has some problems with personal care and was only able to lift items weighing less than five pounds. (R. 785). However, she was able to prepare food, clean, use public transportation, and shop. Id. Dr. Franyutti found Plaintiff to be "partially credible" Id.

Plaintiff returned to Levin & Associates on February 13, 2012, where licensed psychologist, Martin Levin, M.A., completed a psychological evaluation of Plaintiff. (R. 820-24). In his report, Dr. Levin diagnosed Plaintiff with bipolar disorder, moderate borderline intellectual functioning, spinal stenosis, fibromyalgia, bulging discs in neck, nerve damage on right side and lower back pain. (R. 824). Dr. Levin further determined that Plaintiff would have difficulty handling her own expenses, and that her prognosis was poor. Id.

On September 20, 2013, Plaintiff had a psychological evaluation completed by Tony Goudy, PhD. (R. 1012). The purpose of this visit was to determine whether psychological factors could be adversely affecting Plaintiff's ability to pursue substantial gainful activity. Id. Test results indicated that Plaintiff was suffering from severe levels of depression and moderate levels of anxiety. (R. 1016-17). The mental status results revealed "marked impairment in concentration and moderate to marked impairment in recent memory." (R. 1017). Plaintiff presented symptoms consistent with severe Bipolar I Disorder. (R. 1017). Dr. Goudy concluded that Plaintiff meets the criteria under 12.04 C.2. (R. 1018).

On October 14, 2013, Dr. Todd Mages completed a Medical Source Statement after finishing a mental assessment of Plaintiff. (R. 994-97). Dr. Mages rated Plaintiff moderately severe and severe in all functional areas except one, which was the ability to "ask questions or request assistance" in which he gave her a moderate rating. (R. 995). Dr. Mages observed that Plaintiff is unable to care for herself, has impaired memory, is easily overwhelmed, and when under stress becomes psychotic. Id. Furthermore, Dr. Mages opined that Plaintiff has difficulty taking care of her daily living activities, and will likely have difficulty making her follow-up appointments. (R. 996).

## C. Testimonial Evidence

At the administrative hearing held on October 29, 2013, Plaintiff divulged her relevant personal and work related facts. At the time of the hearing, she was forty-four (44) years old. (R. 50). She has a high school diploma and has never taken any college level courses. Id. Plaintiff's employment history includes work as a telemarketer, housekeeper, and cashier. (R. 48-49). Plaintiff last worked at Ollie's Bargain Outlet in

October 2010. (R. 48). Plaintiff did not receive any types of unemployment benefits after her employment ended at Ollie's. Id. However, Plaintiff did file one worker's compensation claim after falling and incurring injuries while working at Ollie's. Id. She testified that she has been unable to work since then. Id.

Regarding her medical condition, Plaintiff claimed she has a lumbar back sprain, a herniated disc in her neck, spinal stenosis, memory loss, confusion and headaches. (R. 49, 52). Plaintiff testified she is supposed to volunteer for approximately 20 hours per week but has been unable to do so due to memory loss and neck and back pain, but explained that hot baths and medication help to ease the pain. (R. 52-54). Plaintiff further testified that she sees a psychiatrist, Dr. Mages, for treatment of her mental problems. (R. 55).

When questioned by her attorney, Plaintiff elaborated on her day-to-day pain and memory loss, explaining that sometimes she has audio and visual hallucinations, her emotions fluctuate from happy to sad on a daily basis, and that she experiences pain when sitting down. (R. 57). This concluded Plaintiff's testimony.

## D. Vocational Evidence

Dr. Larry Ostrowski, an impartial vocational expert (VE), also testified at Plaintiff's administrative hearing. (R. 58). As an initial matter, the VE's classification of Plaintiff's past work was admitted. The ALJ then posed the following hypothetical to the VE:

> Q: Assume a hypothetical individual with no past jobs who is limited to work at the light exertional level, except the work is with occasional postural, except no crawling or climbing of ladders, ropes, or scaffolds; and no exposure to hazards such as unprotected heights and moving mechanical parts; also no concentrated exposure to extreme heat, extreme cold and vibration; must be limited to simple, routine, and repetitive tasks; not able to perform at a production rate pace but can perform goal oriented work; must entail no more than occasional

interaction with supervisors, co-workers, and the public. Can the hypothetical individual perform any work and if so, can you give me a few examples, numbers of jobs for each occupation?

(R.59).

The VE answered in the affirmative and testified that certain jobs were available to such a hypothetical person: marker, mail clerk, inspector packer. (R. 59). The ALJ then asked the VE another hypothetical:

Q: Consider a hypothetical individual with all the same limitations as the first hypothetical. But this second hypothetical, the individual is limited to standing and walking for a total of no more than four hours a day. With this additional limitation here at hypothetical two, can the individual still perform the jobs you listed at hypothetical number one?

(R. 60).

The VE testified that such a person could not do any of the three jobs as they are customarily performed. (R. 60). The ALJ then inquired whether there are other occupations available at this hypothetical. Id. The VE answered in the affirmative testifying that a storage facility rental clerk, sewing machine operator, parking lot attendant, electrical accessories assembler were available to such a hypothetical. (R. 60-61).

The ALJ then proceeded to ask the VE the last hypothetical:

Q: . . . consider a hypothetical individual with all the same limitations as the first hypothetical . . . [b]ut in this hypothetical number three, the individual is limited to work at the sedentary exertional level. Can the hypothetical individual perform any work and if so, can you give me a few examples?

(R. 61).

The VE answered in the affirmative and testified that a person would be able to perform the work of a document preparer, table worker and ampoule sealer. (R. 61).

The ALJ concluded his inquiry by asking the VE how much time is allowed off-task at jobs in the economy, how many unexcused or unscheduled absences employees tolerate, and how many breaks employers permit employees to have each day. (R. 61-62). The VE stated that an individual can be off task up to 10% of the time and can be late, leave work early, or miss an entire day twice per month before experiencing any consequences. He also testified that employers allow employees to have a 15 minute break in the morning, a 15 minute break in the afternoon, and a 30 minute break for lunch. (R. 61-62). All the VE"s answers were consistent with the Dictionary of Occupational Title. (R. 62).

Thereafter, Plaintiff cross-examined the VE, specifically, asking how a weakened grip in a person's strongest hand would affect the performance of the table worker, ampoule sealer, and document preparer, workers that could perform limitations of hypothetical three. Id. The VE answered that he didn't believe a decreased drop would have any effect on performing those three jobs. (R. 63). This concluded Plaintiff's questioning of the VE.

### E. Report of Contact Forms, Work History Reports & Disability Reports

#### 1. Work History Report

On August 19, 2011, Plaintiff completed a work history report. (R. 429–36). In the report, Plaintiff indicated that she had worked at Ollie's, a department store, from September 2010 to October 2010. (R. 429). Plaintiff described her everyday duties as pricing items, unloading trucks, and stocking items. (R. 430). Plaintiff then stated that the position required her to life items including carpet, paint and furniture, with the heaviest weighing 50 pounds and frequently lifting items weighing 25 pounds. Id.

Plaintiff also stated that she worked at Infocision, a marketing company, from January 2010 to August 2010. (R. 429). Plaintiff indicated that she did not do any lifting or carrying at this job, but had to sit for eight hours. Id.

### 2. Disability Reports

On October 16, 2007, Plaintiff completed her first disability report. (R. 338–45). Plaintiff indicated that bipolar and other mental conditions impact her ability to work explaining that she cannot keep a job and that her mood vacillates from severe depression to mania. (R339).

Plaintiff later submitted two disability report-appeal forms in January 2008. On January 14, 2008, Plaintiff indicated that her medication was not helping her. (R. 347-48). On January 28, 2008, Plaintiff indicated that she was more depressed and agitated. (R. 353). Plaintiff stated these symptoms approximately occurred on December 15, 2007. Id. Plaintiff reported that she has to be reminded to do personal hygiene activities and that she has become more depressed since becoming homeless. (R. 356).

On September 2, 2009, Plaintiff completed her second disability report. (R. 377-84). Plaintiff indicated that bipolar, high cholesterol, migraine headaches, depression and anorexia limits her ability to work. (R. 378). Plaintiff stated that she is easily agitated and that she has difficulty concentrating and remembering the tasks of the job. Id.

On August 15, 2011, Plaintiff completed a third disability report. (R. 420-28). Plaintiff indicated that spinal stenosis, slipped discs and nerve damage limits her ability

to work. (R. 421). Plaintiff stated that she stopped working on October 9, 2010, because of these conditions. Id.

On January 9, 2012, Plaintiff completed a fifth disability report. (R. 469-77). Plaintiff indicated that spinal stenosis, fibromyalgia and bulging discs limit her ability to work. (R. 470). Plaintiff stated that she stopped working on October 9, 2010, because of these conditions. Id.

Plaintiff later submitted two disability report-appeal forms in April and July. On April 18, 2012, and July 14, 2012, Plaintiff reported no change on her condition. (R. 495). However in the July report she indicated that she was experiencing side effects from the combination of medications, including dizziness and dry mouth. (R. 505).

### 3. Report of Contact Forms

On January 31, 2012, Rose Bettis completed a report of contact form reporting that Plaintiff did not assert mental allegations on the "current claim" because Plaintiff's Workers Compensation attorney advised her to only report her physical conditions. (R. 491). She further reported that Plaintiff expressed that both her mental and physical limitations prevent her from working. Id.

### F. Lifestyle Evidence

### 1. First Adult Function Report

On October 4, 2007, Plaintiff completed her first adult function report. (R. 325-34). In the report, Plaintiff stated that she lives in a homeless shelter, and explained that she can prepare her meals, manage her money, and shop in stores. . (R. 327-30). She usually eats one meal a day and alleges that she has an eating disorder. Id. Plaintiff has trouble concentrating, completing tasks and remembering dates and

appointments, and stated that her mind is always "wandering." (R. 332). At night, she has difficulty sleeping and explained that she is "lucky to sleep two hours a night. (R. 328). Plaintiff further stated that she has been fired in the past because she was unable to get along with her supervisors and co-workers. (R. 333).

Regarding her mental abilities, Plaintiff has no issues following written instructions, but has difficulty following spoken instructions. Id. Additionally, she does not handle stress or changes in her routine well. (R. 333).

### 2. Second Adult Function Report

Two years later, on September 12, 2009, Plaintiff completed another adult function report. (R. 385-95). Plaintiff stated that she is still not getting much sleep. (R. 388). She needs reminders to dress, bath, and care for her hair, and needs encouragement to eat. Id. Plaintiff indicated that she is able to cook, clean, and do laundry, and stated that receives help from her boyfriend with those activities. (R. 389). Plaintiff still has problems remembering times, dates, and how to get to certain places; but has remained consistent in her ability to shop, handle money, pay bills, count change, and use a checkbook. (R. 390, 392). Furthermore, Plaintiff indicated that she still has difficulty handling stress, following spoken instructions, and getting along with others. (R. 392).

### 3. Third Adult Function Report

On August 19, 2011, Plaintiff completed her third adult function report. (R. 437-444). In the report, Plaintiff stated she has been unable to work again due to having disc degeneration, a slipped disc in her neck, spinal stenosis, and nerve damage. (R.

437).  She described her typical day involves volunteering, but was not specific on what that entailed. (R. 438).

In the report Plaintiff expressed concerns regarding physical limitations that she was experiencing.  She stated that she now has difficulty getting in and out of the bath and she had to dress slower than normal. (R. 438).  She experiences trouble sleeping and is "up every couple of hours pacing in pain." Id.  Plaintiff indicated that she is still able to prepare meals, clean, and do laundry; but expressed that it took her longer to complete these tasks, and sometimes was unable to complete them at all due to pain. (R. 439).  Plaintiff also stated that she can only lift items weighing less than five pounds, and often drops things; she cannot sit for long periods; and cannot walk more than a few blocks before having to take a break. (R. 442).  Plaintiff has remained consistent in her ability to shop, handle money, pay bills, count change, and use a checkbook. (R. 440).  Lastly, Plaintiff stated that she received trigger point injections to treat the swelling and pain, and that her medication, "Robaxim," makes her dizzy and drowsy. (R. 444).

### 4. Fourth Adult Function Report

On January 17, 2012, Plaintiff completed her fourth adult function report. (R. 437-444).  In the report, Plaintiff explained that she continues to have difficulty getting in and out of the bath and now has difficult brushing the back of her hair.  In short, caring for her personal hygiene takes longer than it did in the past. (R. 479).  Plaintiff continues to have difficulty sleeping.  Id.  The amount of time it takes her to prepare meals and complete chores has also increased. (R. 480).  However, Plaintiff indicated that she has no problems handling money, paying bills, counting change, or using a checkbook.

Plaintiff still enjoys reading and browsing the internet. (R. 482). She attends church weekly. Id. However, Plaintiff stated that she cannot walk as far without having to stop. (R. 483). Plaintiff also indicated that she experiences pain in her arms, back and neck, and is only able to lift "super light" things and walk "a few hundred feet." Id. Plaintiff stated that she does not handle stress or changes in her routine well. (R. 484). She reported that her daily medications, Lyrica and Elavil, have been causing her dry mouth, headaches, blurry vision, and a "hung over feeling." (R. 485). Plaintiff has also received spinal injections for pain. Id.

## III. THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. . . . '[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2004). The Social Security Administration uses the following five-step sequential evaluation process to determine whether a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the [RFC] of the claimant is evaluated "based on all the relevant medical and other evidence in your case record . . . ."]

(iv) At the fourth step, we consider our assessment of your [RFC] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (2015); 20 C.F.R. § 416.920 (2012). In steps one through four, the burden is on the claimant to prove that he or she is disabled and that, as a result of the disability, he or she is unable to engage in any gainful employment. Richardson v. Califano, 574 F.2d 802, 804 (4th Cir. 1978). Once this is proven, the burden of proof shifts to the Government during step five to demonstrate that jobs exist in the national economy that the claimant is capable of performing. Hicks v. Gardner, 393 F.2d 299, 301 (4th Cir. 1968). If the claimant is determined to be disabled or not disabled at any of the five steps, the process will not proceed to the next step. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

## IV. THE ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2013.

2. The claimant has not engaged in substantial gainful activity since October 9, 2010, the alleged onset date (20 CFR 416.971 *et seq.*).

3. The claimant has the following severe impairments: bipolar disorder, migraines, degenerative arthritis and chronic cervical and dorsolumbar stains with cervical degenerative disc disease and disc herniation at C4-5 (20 CFR 404.1520(c) and 416.920(c)).

4.	The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526, 416.920(d), 416.925 and 416.926).

5.	After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the work; with occasional postural, except no crawling or climbing of ladders, ropes or scaffolds; and no exposure to hazards such as unprotected heights and moving mechanical parts; also no concentrated exposure to extreme heat, extreme cold, and vibration.  She also must be limited to simple routine and repetitive tasks; not able to perform at a production rate pace but can perform goal oriented work, must entail no more than occasional interaction with supervisors, coworkers, and the public.

6.	The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7.	The claimant was born on July 2, 1969 and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.	The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.	Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR Part 404.1568 and 416.968).

10.	Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.	The claimant has not been under a disability, as defined in the Social Security Act, from October 9, 2010, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

# V. DISCUSSION

## A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)).  In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff contends:

1. The ALJ did not ascertain whether any re-opening issues were present. (Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl's Br.") at 1, ECF No.12).

2. The ALJ discounted all of the psychological evidence leaving no evidence on which the ALJ could rely in making his decision.  Id.

3. The ALJ he failed to discuss why he ignored evidence that contradicted his opinion concerning Plaintiff's credibility. Id.

4. The ALJ committed an error of law by not recognizing Plaintiff's cognitive impairment to be "severe" impairment. Id.

The Commissioner contends:

1. The ALJ properly considered whether plaintiff was disabled during the relevant time period for her present claim, and not a previously adjudicated period. Def.'s Br. in Supp. Of Def.'s Mot. for Summ. J. ("Def.'s Br.") at [5-7], ECF No 13.

2. The ALJ complied with the regulations when considering Plaintiff's medical evidence. (Def.'s Br. at 7–9).

3. Plaintiff is not fully credible (Def.'s Br. at 9–10).

4. The ALJ sufficiently considered Plaintiff's Impairments at Step Two (Def.'s Br. at 10–12).

## C. Whether the ALJ Erred in Failing to Reopen Plaintiff's Previously Denied Disability Claims

Plaintiff contends that the ALJ erred by failing to reopen Plaintiff's previously denied disability claims (Pl.'s Br. at 6). Because Plaintiff's previous Title II and Title XVI applications were denied at the initial level, and the designated time period for reopening had not passed, Plaintiff asserts that the ALJ should have discussed "good cause"[2] issues and inquired into reopening Plaintiff's prior claims. Id. Plaintiff argues that the ALJ erred by not inquiring into such "reopening possibilities." Id.

Defendant, on the other hand, argues that Plaintiff's argument is without merit because the doctrine of *res judicata* bars reconsideration of Plaintiff's prior applications (Def.'s Br. at 6).

An administrative determination *may* be reopened for any reason within twelve months of the date of the notice of the initial determination, or within four years of the

---

[2] Plaintiff asserted that her diagnosis of having a cognitive disorder and borderline intellectual functioning were "good cause issues" that warranted inquiring into reopening previously denied applications.

date of the notice of the initial determination upon finding good cause for reopening (20 C.F.R. §404.988). Good cause for reopening a case will be found if "(1) new and material evidence is furnished; (2) a clerical error was made; or (3) the evidence that was considered in making the determination or decision clearly shows on its face that an error was made" (20 C.F.R. §416.1489).

The rule clearly states that an administrative determination *may* be reopened. The regulation *permits* reopening, it does not *require* it. Additionally, nowhere in Plaintiff's brief does she indicate that she raised this issue before the ALJ or petitioned the ALJ to reopen any previously dismissed applications, and Plaintiff fails to cite any case law or regulation that *requires* the ALJ to inquire into reopening possibilities without formal prompting from either party. As such, the undersigned is of the opinion that Plaintiff's assertion that the ALJ erred in not discussing any reopening issues is without merit.

## D. Whether the ALJ Gave Proper Weight to Physicians' Opinions

Plaintiff next contends that the ALJ erred by giving "little weight" to the evidence emanating from the opinions of Plaintiff's physicians (Pl.'s Br. at 7-8). Specifically, Plaintiff argues that because the ALJ gave little weight to the opinions offered by all of Plaintiff's psychological evaluators, the ALJ's findings concerning Plaintiff's psychological limitations are not supported by substantial evidence. Id.

Defendant counters this by stating "opinions on issues reserved to the Commissioner . . . are never entitled to controlling weight" (Def.'s Br. at 8). Defendant asserts that the Commissioner may discount a medical source's opinion if there is contrary medical evidence or a lack of supporting clinical data. Id.

When evaluating medical opinions, the ALJ should consider "(1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." Johnson v. Barnhart, 434 F.3d 650, 654 (4th Cir. 2005).

The weight an ALJ assigns to a medical opinion generally will not be disturbed unless the ALJ has "dredged up 'specious inconsistencies,' Scivally v. Sullivan, 966 F.2d 1070, 1077 (7thCir. 1992), or has failed to give sufficient reasons for the weight afforded a particular opinion." Dunn v. Colvin, 607 F. App'x 264, 267 (4th Cir. 2015).

Generally, a treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir.2001). If a physician's opinion lacks sufficient clinical evidence or is in conflict with other substantial evidence in the record, then it should be given significantly less weight. Craig v. Chater, 76 F.3d 585, 590 (4th Cir.1996). Thus the ALJ has discretion to give less weight to a treating physician's opinion facing "persuasive contrary evidence." Mastro, 270 F.3d at 178, citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir.1992). Additionally, the more consistent the opinion is with the record as a whole, the more weight the ALJ will give to it. See 20 C.F.R. §§ 404.1527 (c)(4(), 416.927 (c)(4). Furthermore, the longer and more frequent a patient is seen by a physician the greater weight that physician's opinion is given. 20 C.F.R. § 404.1527(c)(2)(i).

In this case, the ALJ was permitted to give the opinions of Plaintiff's psychological evaluators little weight because of persuasive contrary evidence within the record. The ALJ found that the opinions of the Plaintiff's psychological evaluators were inconsistent with substantial evidence in the record of Plaintiff's routine activities. See Burger v. Comm'r, Soc. Sec. Admin, 2015 WL 467662, at *3 n.2 (D. Md. Feb. 2, 2015) (finding that substantial evidence supported the ALJ affording medical opinions less than controlling weight); See also Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) (explaining that Plaintiff's pattern of daily activities suggests Plaintiff is not disabled.) The ALJ noted that Plaintiff "is independent in personal activities and is able to prepare meals, clean, do laundry, perform community service, use public transportation, shop for groceries and personal items, pay bills, count change, handle a savings account, use a checkbook or money order, read for pleasure, use the internet, play games online, watch television and attend church weekly," (R. 25) and as a result concluded that Plaintiff has mild limitations in her activities of daily living, and moderate limitations in social functioning and concentration, persistence, and pace. (R. 29).

While Dr. Goudy and Dr. Mages opined that Plaintiff had disabling mental impairments, the ALJ refuted their opinions explaining again that Plaintiff's daily activities suggest otherwise. Additionally, while Dr. Goudy opined that Plaintiff "had a residual disease process that resulted in such a marginal adjustment that even a minimal increase in mental demands or change in environment would be predicted to cause the individual to decompensate," (R. 29) the ALJ refuted Dr. Goudy's opinion stating (1) Dr. Goudy only examined the plaintiff on one occasion; (2) the Plaintiff did not suffer from any "extended episodes" of decompensation, emphasizing that Plaintiff

hospital stay was only for 10 days and not two weeks; and (3) there was no evidence in the record that Plaintiff would decompensate with "even minimal increase in mental demands or change in environment as suggested by Dr. Goudy, explaining that Plaintiff is capable of living in a homeless shelter environment, performing community service, using public transportation, managing her finances, shopping in stores, using the internet, reading, attending church and maintaining a romantic relationship." (R. 29).

Regarding Dr. Mages' opinion, the ALJ highlighted the fact that Dr. Mages has not treated Plaintiff over a longitudinal period, but that he only treated her during her 10-day hospital stay. The ALJ also noted an inconsistency in Dr. Mages opinion, that Plaintiff had "marked and extreme limitations" in her activities of daily living, social functioning and concentration persistence and pace, but had a GAF, or Global Assessment of Functioning[3] score reflecting only serious to moderate symptoms. (R. 30). Furthermore, the ALJ explained that the GAF scores of 50 were not supported by the "objective findings of the record which did not reflect the type of longitudinal deficits or need for intensive treatment contemplated by GAF assessments of 50 or below. The ALJ reiterated Plaintiff's ability "to live in a homeless shelter, perform personal care tasks, prepare meals, perform household chores, perform community service, get along with friends, family, neighbors and authority figures, shop in stores, use public transportation, manage her finances, socialize online by chatting with friends and using Facebook, play online games, read, work on puzzles, watch television, maintain a romantic relationship, and attend church weekly." (R. 31).

---

[3] GAF scores represent a "clinician's judgment of the individual's overall level of functioning." <u>Clemins v. Astrue</u>, No. 5:13CV00047, 2014 WL 4093424 at *1(W.D.Va. Aug. 18, 2014) (quoting Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32 (4th ed. 2000). GAF Scores do not do not have "direct legal or medical correlation to the severity requirements of social security regulations," but instead, are intended be used to make treatment decisions, and may be used to inform the ALJ's Judgment. <u>Id</u>. (citation omitted).

The two State Agency psychological consultants, Ann Logan, Ph.D. and G. David Allen, Ph.D., opined that Plaintiff's mental impairment was non-severe and that she had mild limitations in her activities of daily living, maintaining social functioning and maintaining concentration, persistence or pace, and no extended episodes of decompensation. (R. 31). The ALJ however discounted their opinion citing specific medical records suggesting otherwise, and stating that the evidence of the record supports finding that Plaintiff's mental health condition is severe. Id. Thus, although Plaintiff gave the opinions of the four psychological evaluators little weight but found that Plaintiff has a severe mental impairment, the undersigned is of the opinion that the ALJ provided substantial evidence, citing specific medical records supporting his conclusion of Plaintiff's severe mental impairment. Stated differently, despite the various opinions of Plaintiff's psychological evaluators about her limitations and episodes of decompensation, substantial evidence supports the ALJ affording these opinions little weight.

### E. ALJ's Determination of Plaintiff's Credibility

The undersigned next turns to the ALJ's consideration of Plaintiff's credibility. Plaintiff contends that the ALJ ignored evidence that contradicted his opinion concerning Plaintiff's credibility (Pl's Br. at 1). However, Defendant argues that it is within the ALJ's discretion to reject Plaintiff's subjective complaints after weighing them against the medical evidence, and that Plaintiff's claim that mental impairments disabled her from all work was not consistent with the record. (Def.'s Br. at 9).

"[T]he determination of whether a person is disabled by pain or other symptoms is a two-step process." See Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996); see also

20 C.F.R. § 404.1529(c)(1) (2011); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

First, the ALJ must expressly consider whether the claimant has demonstrated, through objective medical evidence, that a medical impairment exists that is capable of causing the degree and type of pain alleged. See Craig, 76 F.3d at 594. Second, the ALJ must consider the credibility of the claimant's subjective allegations of pain in light of the entire record. Id.

Social Security Ruling 96-7p sets out several factors for an ALJ to use when assessing the credibility of a claimant's subjective symptoms and limitations, including:

1.    The individual's daily activities;

2.    The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3.    Factors that precipitate and aggravate the symptoms;

4.    The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5.    Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6.    Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for [fifteen] to [twenty] minutes every hour, or sleeping on a board), and

7.    Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). An ALJ need not document specific findings as to each factor. Wolfe v. Colvin, No. 3:14-CV-4, 2015 WL 401013, at *4 (N.D. W. Va. Jan. 28, 2015). However, the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be

sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186 at *2. Because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's observations concerning the claimant's credibility are given great weight. Shively, 739 F.2d at 989-90. This Court has determined that "[a]n ALJ's credibility determinations are 'virtually unreviewable' by this Court." Ryan v. Astrue, No. 5:09CV55, 2011 WL 541125, at *3 (N.D. W. Va. Feb. 8, 2011). If the ALJ meets his or her basic duty of explanation, then "an ALJ's credibility determination [will be reversed] only if the claimant can show [that] it was 'patently wrong.'" Sencindiver v. Astrue, No. 3:08-CV-178, 2010 WL 446174, at *33 (N.D. W. Va. Feb. 3, 2010) (quoting Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000)).

In the present case, the undersigned finds that the ALJ properly followed the two-step process when determining that Plaintiff is "not entirely credible." (R. 27). First, the ALJ determined that Plaintiff had proved that she suffers from severe medical impairments capable of causing the symptoms alleged. (R. 27), including: "bipolar disorder, migraines, degenerative arthritis, chronic cervical and dorsolumbar strains with cervical degenerative dis disease and disc herniation at C4-5." . (R. 23). Second, the ALJ examined the factors outlined in SSR 96-7p when assessing the credibility of Plaintiff's subjective allegations in light of the entire record. (See R. 27--29).

### i. Plaintiff's Daily Activities

The ALJ considered Plaintiff's daily activities (factor one) when making his credibility determination. The ALJ noted that Plaintiff has  the ability to perform personal

hygiene tasks, prepare meals, perform chores, do laundry, do community service work, use public transportation, shop in stores, work on puzzles and use a computer. (R. 28).

### ii.    Plaintiff's Pain and Other Symptoms

The ALJ also discussed the location, duration, frequency and intensity of Plaintiff's pain and other symptoms (factor two). Regarding Plaintiff's pain, the ALJ noted that Plaintiff stated that she has "constant pain in her back and neck." . (R. 27). As for her other symptoms, the ALJ noted that Plaintiff demonstrated "giveaway weakness in her right upper extremity on several occasions," and that she experiences confusion including not knowing why she went somewhere and not understanding what people tell her.  (Id.)

### iii.    Plaintiff's Pain Medication

The ALJ examined the medication that Plaintiff is prescribed for her pain (factor four), and listed the medications as "Flexeril Mobic, Naprosyn, Voltaren, Lorcet, Neurontin, Amitriptyline, a Medrol Dosepak, Prednisone, Ultrams, Elavil, Lyrica, Zyprexa and Remeron. (R. 28).

### iv.    Other Treatment and Measures Used to Relieve Pain

Next, the ALJ reviewed treatment other than medication that Plaintiff has received for pain and symptom relief (factor five). For example, the ALJ highlighted several facts. First, the ALJ noted that Plaintiff was referred to physical therapy, but only attended two session. (R. 28).  Second, the ALJ noted that Plaintiff underwent trigger point injections and cervical epidural sterod injections. (Id.). Third, the ALJ noted that, Plaintiff has not "pursued surgery for her cervical spine issues." . (R. 29).  Finally, the

ALJ noted that Plaintiff was "enrolled in a two week outpatient partial hospitalization program in August of 2012 for group therapy, individual therapy, medication management and improvement of symptoms." . (R. 28).

### v. Plaintiff's Work History

The ALJ also considered Plaintiff's work history when assessing her credibility. Specifically, the ALJ noted that Plaintiff has a poor work history and testified that she quits jobs after a short period of time for no particular reason." (R. 29). The ALJ concluded that Plaintiff's poor work history "indicates [Plaintiff's] poor motivation to work and undermines the credibility of her allegations." (R. 29). Plaintiff argues that the ALJ erred when drawing this conclusion, contending that the ALJ erred by not crediting Plaintiff's statements addressing why she has never been able to keep a job and asserting that Plaintiff's failure to retain employment is evidence of Plaintiff's psychological condition, which the ALJ ignored. (Pl.'s Br. at 9, 10). Defendant counters that Plaintiff's statements are inconsistent with the record.

The undersigned finds that the ALJ supported his conclusion with substantial evidence in the record citing inconsistencies with Plaintiff's daily activities and her alleged claims. See R. at 28 (ALJ noting despite Plaintiff's physical and mental impairments, she retained the ability to perform personal hygiene tasks, prepare meals, perform chores, do laundry, do community service work, use public transportation, shop in stores, work on puzzles, use a computer, pay bills, count change, handle a savings account use a checkbook or money order, read, and watch television.)

Moreover, while Plaintiff contends that the ALJ erred by failing to discuss evidence that contradicts his position, and more specifically, suggests the ALJ

disregarded the fact that Plaintiff volunteered to be eligible for a bed at the homeless shelter and got lost while using public transportation, the undersigned finds Plaintiff's argument untenable for three reasons. First, the ALJ acknowledged that Plaintiff stated that "she experiences confusion including not knowing why she went somewhere." (R.27). Second, the undersigned finds that the *reasons* why Plaintiff volunteers are irrelevant and that the issue is whether Plaintiff has the *ability* to volunteer. Lastly, it is not necessary for the ALJ to comment on every piece of evidence in the record. See Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014) (stating that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision").

An ALJ is required to *consider* all of the relevant medical evidence submitted by a claimant. 20 C.F.R. § 416.920; see also Reid, 769 F.3d at 865 (declaring that, if an ALJ states that the "whole record was considered, . . . absent evidence to the contrary, we take [him] at [his] word). However, an ALJ is "not obligated to *comment on* every piece of evidence presented." Pumphrey v. Comm'r of Soc. Sec., No. 3:14-CV-71, 2015 WL 3868354, at *3 (N.D. W. Va. June 23, 2015). Instead, an ALJ's decision need only "contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating [his or her] determination and the reason or reasons upon which it is based." Reid, 769 F.3d at 865. In other words, an ALJ need only "provide a minimal level of analysis that enables [a] reviewing court[ ] to track the ALJ's reasoning." McIntire v. Colvin, No. 3:13-CV-143, 2015 WL 401007, at *5 (N.D. W. Va. Jan. 28, 2015). (Def.'s Br. at 10).

Here, while the ALJ did not specifically address Plaintiff's reasoning, the ALJ

observed inconsistencies in Plaintiff's daily activities with the record and made his determination. Consequently, the undersigned finds that the ALJ did not err in not discussing every contradictory piece of evidence in the record or in considering Plaintiff's work history in her credibility determination.

> **vi.  Substantial Evidence Supports the ALJ's Credibility Determination**

Although the undersigned cannot make credibility determinations, the undersigned is empowered to review the ALJ's decisions for substantial evidence. Johnson, 434 F.3d at 658. When assessing substantial evidence, courts looks for "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990) (citation omitted). After a careful review of the ALJ's decision and the evidence of record, the undersigned finds that the ALJ's credibility determination is sufficiently specific to make clear his reasoning in finding Plaintiff not entirely credible. Thus, the burden was on Plaintiff to show that the ALJ's credibility determination is patently wrong. Plaintiff failed to meet this burden. Consequently, the undersigned accords the ALJ's credibility determination the great weight to which it is entitled.

## F.  Plaintiff's Cognitive Brain Disorder Diagnosis

Lastly, Plaintiff contends that the ALJ erred when he failed to recognize her cognitive disorder diagnosis as a severe impairment. Plaintiff contends that the objective evidence showed white-matter damage to Plaintiff's brain, that her treating physician indicated that she suffers from a cognitive disorder, and that other evidence of Plaintiff's disorder showed more than minimal limitations in her ability to perform substantial gainful activity (Pl's Br. 13,14).

Defendant counters this stating that the ALJ sufficiently considered Plaintiff's limitations from her impairments before determining she could perform other work.

To determine whether a disability exists, the claimant bears the burden of proving that he or she suffers from a medically determinable impairment that is severe in nature. Farnsworth v. Astrue, 604 F. Supp. 2d 828, 851 (N.D. W. Va. 2009). When proving that he or she suffers from a medically determinable impairment, the claimant must show more than a "mere diagnosis of condition . . . . [I]nstead, there must be a showing of related functional loss." Pierce v. Colvin, No. 5:14CV37, 2015 WL 136651, at *16 (N.D. W. Va. Jan. 9, 2015) (citations omitted).

Here, although Plaintiff's brain revealed white matter changes, medical records revealed that the changes were not significant for any demyelinating disease. (R. 953). Consequently, the undersigned finds Plaintiff's assertion that her cognitive disorder should be classified as a severe impairment because of white matter changes in her brain, is without merit.

An impairment is severe when, whether by itself or in combination with other impairments, it significantly limits a claimant's physical or mental abilities to perform basic work activities. 20 C.F.R. § 404.1520(c). Basic work activities are "the abilities and aptitudes necessary to do most jobs," including capacities for seeing, hearing and speaking and physical functions such as walking and standing. 20 C.F.R. § 404.1521(b).

Any impairment must result from abnormalities, which can be shown by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1508. Unless the impairment will result in death, it must have lasted or be expected to last for a

continuous period of at least twelve months. 20 C.F.R. § 404.1509. An impairment, however, can be considered "'not severe' only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984).

If the claimant is alleging a mental impairment, however, the ALJ must forgo the traditional analysis and utilize a "special technique" applying the "paragraph B criteria" under the regulations. 20 C.F.R. § 404.1520a(b); see also 20 C.F.R. Pt. 404, Subpt. P. App. 1., § 12.00(C)(1–4). Four elements comprise these "paragraph B criteria": (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. Pt. 404, Subpt. P. App. 1., § 12.00(C)(1–4). The regulations require the ALJ to document application of the technique, rate the four "paragraph B criteria" using certain labels, and list pertinent findings in support. See 20 C.F.R. § 404.1520a. If the ALJ rates the degree of limitations as "mild" in the first three elements and "none" in the fourth element, then "we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities." 20 C.F.R. § 404.1520a(d)(1).

Activities of daily living "include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." 20 C.F.R. Pt. 404, Subpt. P. App. 1., § 12.00(C)(1). To evaluate a claimant's daily activities, the ALJ will "assess the quality of these activities by their

independence, appropriateness, effectiveness, and sustainability. We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction." Id.

Social functioning "refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals" and also "includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers." Id. at § 12.00(C)(2). A claimant "demonstrate[s] impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation"; a claimant can, on the other hand, also "exhibit strength in social functioning by such things as your ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities." Id.

Concentration, persistence or pace "refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." Id. at § 12.00(C)(3).

Finally, episodes of decompensation "are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." Id. at § 12.00(C)(4). These episodes can be "demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two)." Id. To determine whether a claimant suffered an episode of decompensation, the ALJ may infer it "from medical records showing significant alteration in medication; or

documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode." Id.

Here, the ALJ rejected Plaintiff's cognitive brain disorder and psychosis diagnoses concluding that they are not consistent with the longitudinal medical evidence of the record. (R. 24). Regarding the "paragraph B criteria," the ALJ rated Plaintiff having "mild restriction" in activities of daily living; and moderated limitations in social functioning and concentration, persistence or pace. (R. 25). The ALJ also noted Plaintiff had never suffered an episode of decompensation either, emphasizing that Plaintiff's ten day hospitalization in July 2013 was not extended duration. Id. To provide support for his paragraph B criteria analysis, the ALJ stated the following:

> In activities of daily living . . . [Plaintiff] is able to prepare meals, clean, do laundry, perform community service, use public transportation, shop in stores for groceries and personal items, pay bills, count change, handle a savings account, use a check book or money order, read for pleasure, use the internet, play games online, watch television and attend church weekly.

> In social functioning . . . [Plaintiff] reported difficulties with understanding and getting along with people and isolating herself when she becomes angry. However, she lives in a homeless shelter and is able to get along with the other residents, spends time with people in the dining room and reported being able to get along with friends, family neighbors and authority figures. She is also able to use public transportation, shop in stores, go to church weekly, socialize online by chatting with friends and using Facebook and maintains a romantic relationship.

> With regard to concentration, persistence or pace, . . . [Plaintiff] is able to perform community service, prepare meals, perform chores, do laundry, use public transportation, shop in stores for food and personal items, attend church, read, use the internet, play online games, pay bills, count change, handle a savings account, use a checkbook or money order, work on puzzles and watch television.

(R. 25).

Despite Plaintiff's complaint that the ALJ failed to recognize her cognitive disorder diagnosis as a severe impairment, the undersigned disagrees and finds that the ALJ followed the correct procedures in making this determination. In his decision, the ALJ examined each of the four "paragraph B criteria," issued the correct ratings to each one, and included pertinent facts to support his decision. (R. 13–14).

Nevertheless, even if the ALJ's analysis on the "paragraph B criteria" were lacking in some aspects, this Court "will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008); see also Keys v. Barnhart, 347 F.3d 990, 994-95 (7th Cir. 2003) ("The doctrine of harmless error . . . is fully applicable to judicial review of administrative decisions"); Ngarurih v. Ashcroft, 371 F.3d 182, 190 n.8 (4th Cir. 2004) ("reversal is not required where the alleged error clearly had no bearing on the procedure used or the substance of the decision reached").

The record supports the ALJ's analysis that Plaintiff's cognitive brain disorder was not a severe impairment. Plaintiff's daily activities and concentration, persistence or pace were not severely limited: Plaintiff continued to do housework, prepare meals, read, watch television, do loads of laundry, handle money, and pay the bills. (R. 25, 28). Regarding her social functioning, Plaintiff still was able to attend church weekly, socialize online, and maintain a romantic relationship. (R. 25, 28).

The undersigned therefore concluded that Plaintiff suffered no severe limitation in the "paragraph B criteria" and substantial evidence supports the ALJ's analysis.

## VI. RECOMMENDED DECISION

For the reasons herein stated, I accordingly recommend Defendant's Motion for Summary Judgment be **GRANTED,** and the Plaintiff's Motion for Summary Judgment be **DENIED** and this matter be dismissed and struck from the Court's docket.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to provide an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 13th day of July, 2016.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE